763 P.2d 1144

**Doyle HARTMAN, an individual, Plaintiff–Appellee,**

v.

**EL PASO NATURAL GAS COMPANY, Defendant–Appellant.**

**No. 17094.**

Supreme Court of New Mexico.

Oct. 4, 1988.

Rehearing Denied Nov. 2, 1988.

Montgomery & Andrews, Gary R. Kilpatric, Joseph E. Earnest, W. Perry Pearce, Sarah M. Singleton, Santa Fe, Andrews & Kurth, Rush Moody, Jr., Atkin, Gump, Strauss, Hauer & Feld, Randall L. Sarosdy, Washington, D.C., Donald J. MacIver, Jr., James M. Gaitis, El Paso Natural Gas Co., El Paso, Tex., for defendant-appellant.

Atwood, Malone, Mann & Turner, Bob F. Turner, Susan Zeller, Jeffery D. Tatum, Roswell, Maddox, Renfrow & Saunders, Don R. Maddox, Hobbs, J.E. Gallegos, Campbell & Black, Michael B. Campbell, Santa Fe, for plaintiff-appellee.

## OPINION

SOSA, Senior Justice.

## PART ONE: PROCEDURAL CONTEXT

### A. AMENDED COMPLAINT

On September 12, 1986, plaintiff-appellee, Doyle Hartman (Hartman), filed his amended complaint against defendant-appellant, El Paso Natural Gas Company (El Paso), alleging that El Paso had intentionally and maliciously breached various gas purchase contracts entered into between Hartman as seller-producer and El Paso as purchaser-pipeline. Hartman also alleged certain tortious conduct, violations of the New Mexico Antitrust Act, and sought a permanent injunction requiring El Paso to abide by and perform its obligations under the buy-sell contracts, to cease and desist from "shutting in" (closing down) certain of Hartman's wells, and requesting certain other minor injunctive relief. For purposes of this appeal, the relevant portions of Hartman's amended complaint are those allegations pertaining to breach of contract and the two items of injunctive relief specified above. Hartman sought both compensatory and punitive damages.

### B. EL PASO'S AFFIRMATIVE DEFENSES

In addition to filing a general denial of Hartman's claims, El Paso, on several occasions, filed certain affirmative defenses. The most recently filed and only relevant affirmative defenses, insofar as this appeal is concerned, are as follows: (i) El Paso's *force majeure* defense, in which it alleged that it was excused from performance under the contracts at issue because "there had been an unforseeable collapse of market demand in the middle portion of" the 1980's, coupled with new state and federal regulations which substantially changed the scope and thrust of the contracts at issue; (ii) El Paso's commercial impracticability and frustration of purpose defenses, in which it alleged that policies of the Federal Energy Regulatory Commission (FERC) "erode[d] the demand for higher priced [i.e., Hartman's] gas produced under contract to the [various gas] pipelines," thereby excusing its performance under the contracts; (iii) that enforcement of the contracts at issue would violate public policy, as determined by the State of New Mexico's Energy, Minerals and Natural Resources Department, and the Oil Conservation Division thereof (OCD), thereby excusing El Paso from performance of the contracts at issue; (iv) that the entire substance of the contracts at issue was (a) pre-empted by federal law and regulations promulgated thereunder by FERC, and (b) irreparably transformed to El Paso's detriment by regulations promulgated by FERC, OCD, and the California Public Utilities Commission, thereby excusing El Paso's performance under the contracts at issue.

### C. PRE–TRIAL ORDERS

The parties filed various pre-trial motions, the full extent of which is not relevant to this appeal. Certain orders, however, issued by the trial court in response to these motions, constitute the core of El Paso's appeal:

(i) the court's "Order Pursuant to Rule 56(d), N.M.R.Civ.P [sic]" (correctly cited as SCRA 1986, 1–056(D)), 1986, which elimi-

nated from the case, as a matter of law, a major portion of El Paso's affirmative defenses, *as to five of the natural gas contracts.*

(ii) the court's "Partial Summary Judgment on the Oil Well Casinghead Contracts," issued on November 12, 1986, which concluded that El Paso was "liable to take *all* of the gas under the Oil Well Casinghead Contracts [1] and to pay for such gas at the contract price." (Emphasis added.)

(iii) the court's "Order Striking Defenses" issued December 2, 1986, which extended the above ruling to the remainder of the contracts at issue. Thus, by December 2, 1986, all of El Paso's affirmative defenses as to *all contracts at issue in this case* had, as a matter of law, been stricken;

(iv) the court's "Order Denying [El Paso's] Motion for Reconsideration," issued on October 1, 1986, which upheld the court's earlier ruling that El Paso, in "inadvertently producing" certain documents and giving these documents to Hartman's counsel, waived its attorney-client privilege as to those documents. Further, by the same order, the court ruled that El Paso had also waived work-product immunity "on the same subject matter," and thus required El Paso to produce certain other pertinent documents. For reference *infra,* these documents came to be numbered as Hartman's exhibits, beginning with Number 124, the crucial "inadvertent document" triggering production of documents later numbered as exhibits 104, 120, 137, 146, 154, 206 and 207. The practical consequence of the court's order was to require El Paso to produce confidential,

in-house information written by key El Paso personnel during the period July 1, 1982 to June 18, 1986, a period when the events complained of in Hartman's amended complaint were taking place.

## D. TRIAL, JURY VERDICT AND JUDGMENT ON THE VERDICT

Jury trial lasted from December 1 to December 19, 1986. The jury found in favor of Hartman and awarded him $2,153,000 in compensatory damages [2] and $1,080,000 in punitive damages. The court entered judgment on the verdict on January 22, 1987, awarding post-judgment interest on the combined damages at the rate of fifteen percent.

## E. PERMANENT INJUNCTION

On March 24, 1987, the court issued its permanent injunction, issued thirty-five findings of fact and ten conclusions of law, and ruled, in pertinent part, as follows: (i) El Paso is required, as to the contracts covering Hartman's *dry gas wells,* to take Hartman's dry gas "in the maximum proportion of deliverability [3] that gas is being produced within the terms of the applicable ratable take [4] provisions" of the contracts involved; (ii) El Paso is required, as to the contracts covering Hartman's *casinghead wells* and *gas wells in oil pools,* to "take and pay contract price for all gas produced by casinghead wells and by gas wells in oil pools, up to allowable limits [5] for casinghead gas as defined" by certain regulations of the OCD; (iii) El Paso is required to "exercise good faith in the manner in which

---

**1.** As will be developed in more detail later in this opinion, there were thirty-three contracts governing the sale and purchase of casinghead gas, and forty-three contracts governing the sale and purchase of gas produced from natural gas wells. "Casing–Head Gas" is defined as "Natural gas from an oil well, saturated with oil vapors or gasoline." *Black's Law Dictionary* 273 (4th ed. rev. 1968). The gas produced from natural gas wells, on the other hand, is commonly termed "dry gas."

**2.** The court allowed El Paso "a credit against dry gas takes from non-marginal wells in pools presently classified as prorated for the jury award of $2,153,000 in compensatory damages,"

according to a complicated formula which is not relevant to our determination of the issues on appeal.

**3.** As to the concept of "maximum proportion of deliverability," see generally, NMSA 1978, §§ 70–2–1 to –38, known as the "Oil and Gas Act," and in particular § 70–2–16(C).

**4.** As to the concept of "ratable take," see the balance of this opinion, *infra.*

**5.** As to the concept of "allowable limits," see NMSA 1978, § 70–2–16(C).

it performs" the requirements mandated by the permanent injunction.

## F. ISSUES RAISED BY EL PASO ON APPEAL

On appeal, El Paso contends: (i) that the trial court's jurisdiction to decide this case was pre-empted by federal law; (ii) that genuine issues of material fact existed as to the stricken affirmative defenses; (iii) that the OCD's jurisdiction pre-empted that of the trial court as to "nominations and allowables;" [6] and (iv) that the trial court abused its discretion in ruling against El Paso as to the documents which El Paso alleged were protected from discovery by attorney-client privilege and work-product immunity. Accordingly, El Paso asks us to reverse and vacate the jury verdict and judgment thereon and quash the permanent injunction, or in the alternative, to vacate the judgment and remand the cause for a new trial in which El Paso is permitted "to introduce evidence substantiating its affirmative defenses," and in which "the jury not be permitted to hear evidence or arguments concerning the privileged or immune documents at issue."

## G. OUR HOLDING ON APPEAL

We reject each of El Paso's contentions on appeal, affirm the trial court's judgment on the jury verdict, and order El Paso to abide by and honor, in good faith and in detail, the trial court's permanent injunction.

## PART TWO: FACTS

## A. GEOGRAPHICAL AND HISTORICAL BACKGROUND

El Paso is a natural gas transporting and sales company, whose pipelines intersect the Permian Basin in Texas and New Mexico, the Anadarko Basin in Oklahoma, and the San Juan Basin in New Mexico. On appeal, the relevant pools of natural gas involved are the Eumont Pool and the Jalmat Pool, both located in southeastern New Mexico. Hartman is a producer of natural gas, and operates wells which pump gas from the Eumont and Jalmat pools. Most of Hartman's wells lie in Lea and Eddy counties, New Mexico. Hartman operates some 95 dry gas wells on acreage dedicated to El Paso under the contracts at issue. El Paso's pipeline runs in roughly a north by northwest direction through the Jalmat and Eumont pools, which are located south to southwest of Hobbs, New Mexico.

For some reason, neither party on appeal has chosen to state when their contractual relationship began. From the record, however, we can glean enough information to conclude that well before 1982 the parties had been enjoying a mutually satisfactory and profitable relationship.

Our opinion would be too exhaustive to read if we were to quote extensively from all of the documents produced before and during trial. Thus, we shall quote only from the "triggering memo," relevant to the lower court's order of October 1, 1986, Exhibit 124, written to an El Paso executive by El Paso's in-house attorney, on May 24, 1984. Before summarizing relevant statutes in Oklahoma, Texas and New Mexico, the attorney states the purpose of his memo to be "the extent of El Paso['s] * * * obligation to take ratably across its system and the extent of El Paso's ability to take more gas from less expensive systems. This memorandum sets forth my conclusions." The attorney's conclusions were as follows:

> There are, however, certain risks to adopting such a limited least-cost production scheduling policy. While El Paso could continue to raise the argument that, since it is complying with the letter of all applicable ratable take statutes, it is excused from prepayment obligations under take-or-pay contracts, a great deal of the persuasive force behind El Paso's position would have been lost. Producers which formerly were convinced not to press prepayment claims, because of their belief that El Paso was being fair and evenhanded, would likely file lawsuits claiming prepayments. Such suits could cover not only the current year but any past year in which El Paso's takes, though ratable across its system, were less than the contractual minimum. Be-

---

6. See *id.*

cause of the tendency to settle lawsuits rather than litigate, especially where the defenses are untested and questionable, a flood of lawsuits would doubtless result in a large amount of negotiated prepayments. This, of course, would lead to higher resale prices and possible lower sales, thereby aggravating El Paso's deliverability surplus and prepayment problem.

This memo inspired El Paso's decision makers to formulate its "least-cost production" strategy, as spelled out in other disputed documents, and in its May 1986 "Strategic Plan." This plan had already been outlined to producers, including Hartman, in El Paso's "Notice to Sellers," dated February 28, 1986. In that notice, El Paso advised Hartman:

> El Paso intends to modify its production-scheduling procedures in a manner that maximizes, to the extent practicable and legally permissible, the purchases of gas from El Paso's lowest cost sources of supply.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> El Paso must take immediate action to reduce its sales rates.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> If El Paso's price becomes noncompetitive \* \* \* with other gas supplies or with alternative fuels, El Paso may be forced to take more drastic price actions or to make further modification to its production-scheduling procedures. We will strive to keep you informed if such actions become necessary.

The trial court found that El Paso ignored the ratable take provisions of its contracts with Hartman, and instead favored its own affiliates, notably "Meridian," and "Southland Royalty," in purchases of gas. The jury found that El Paso "nominated" or *predicted* in bad faith how much of Hartman's allowable production it would take. El Paso had created El Paso Gas Marketing Company to enter into and compete with other purchasers on the spot market, and to submit joint nominations with El Paso for purchasable gas. The record shows that El Paso and El Paso Gas Marketing Company were essentially interchangeable names for the same entity.

Since the allowable limits which the OCD established in its rules and regulations were to a large degree determined by previous purchasing patterns, the OCD's setting of allowables for Hartman's wells was based largely on El Paso's own purchasing volume. To that extent, the court found that El Paso manipulated the OCD's mandate to Hartman as to how much gas he could produce. As El Paso reduced its purchases from the Jalmat and Eumont Pools, for example, the OCD's determination of Hartman's allowables would decrease commensurately. On April 21, 1986, El Paso wrote to Hartman and other producers, announcing, "El Paso hereby proposes to release you from your commitment, under applicable contracts \* \* \*."

In his amended complaint, Hartman alleged that beginning January 1, 1985, El Paso "unilaterally reduced the price paid for dry gas actually taken from certain of [his] wells," and that beginning June 1, 1986, "El Paso has unilaterally reduced the price paid for oil well casinghead gas and gas well casinghead gas taken under the Contracts." The trial court found that El Paso's actions were "in wanton disregard of [Hartman's] contractual rights."

El Paso's net worth in 1985 was $1,069,258,000, while in 1986 its net worth had increased to $1,140,300,000. Hartman filed his original complaint on April 8, 1986, following El Paso's "shutting in" (closing down) of some eighty-five of his wells. These wells remained shut in until the court issued its permanent injunction.

## B. NATURE OF THE CONTRACTS BREACHED

The contracts involved here are varied, complex and lengthy. We shall speak of four varieties of contracts containing ratable take clauses. These contracts cover both Hartman's *prorated gas,* that is, gas covered by the "allowable" system defined in NMSA 1978, Section 70–2–16, and pertinent OCD regulations, as well as his *nonprorated* gas. Generally speaking, the four varieties of ratable take contracts require that El Paso purchase gas from the prorated pools in some stated pro-rata portion of Hartman's allowable limit of pro-

duction, and at full deliverability for his *non-prorated* wells. There is, in addition, a type of contract clause designated by the parties as a "Type 5 Ratable Take Clause," which in actuality simply restates El Paso's obligation to purchase gas under all contracts up to allowable limits.

In addition to this classification system, the parties by stipulation classified the contracts according to "Wells for Which Damages Have Been Claimed For Alleged Non–Ratable Taking" (81 of such wells), "Wells for Which Price Claims Have Been Made" (32 of such wells), and "Wells on Which No Damages Have Been .Claimed" (38 of such wells). With reference to the first two catagories of wells discussed in this paragraph, there is overlap, in that some wells fall into both categories, while wells in the third category discussed in this paragraph are covered by the permanent injunction but were not wells for which contract damages were claimed.

The trial court based its conclusion of irreparable damage to Hartman largely on the fact that ninety-two percent of Hartman's gas production is subject to his contracts with El Paso, and that ninety-five percent of his income is derived from his Lea County production. The trial court found, based on the record as we have summarized it, that "[b]ecause of [El Paso's] ongoing breach of its contracts with [Hartman], [Hartman] will continue to suffer a substantial loss of revenue, inhibiting his present and future ability to explore for, produce and sell natural gas."

### PART THREE: LEGAL ISSUES RAISED ON APPEAL

A. WAS THE TRIAL COURT'S JURISDICTION PRE–EMPTED BY FEDERAL LAW? OUR DECISION: NO.

■ El Paso argues for an affirmative answer to this question by citing several Supreme Court and federal cases which are inapposite. The principal error El Paso makes is to confuse cases involving pipelines versus consumers, on the one hand, and state regulatory agencies' decisions versus federal statutory authority, on the other. The present appeal involves neither

of these issues. It is a contract case, and neither the Natural Gas Act (NGA) nor the Natural Gas Policy Act (NGPA) [7] precludes a state court from deciding issues involving oil and gas contracts which are regulated *tangentially and peripherally*, insofar as the legal issues herein are concerned.

Thus, contrary to what El Paso argues, *Northern Natural Gas Co. v. State Corp. Commission of Kansas*, 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963), did not prohibit the trial court here from asserting jurisdiction. In that case the principal contract at issue was not before the Supreme Court on appeal. Further, the *producer* of natural gas was not a party to the suit. *Northern Natural Gas Co.* involved a state agency's entanglement in federal affairs. The case before us involves the issue of a private party attempting to enforce a private contract against a corporation. Likewise, *Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Board of Mississippi*, 474 U.S. 409, 106 S.Ct. 709, 88 L.Ed.2d 732 (1986), relied on by El Paso, is not on point. In that case, the issue was similar to the issue raised in *Northern*. Further, the Court in *Transcontinental Gas Pipe Line Corp.* explicitly distinguished between FERC's jurisdiction and the role which free market forces must play in oil and gas contracts such as the one before us:

> To the extent that Congress denied FERC the power to regulate affirmatively particular aspects of the first sale of gas, it did so because it wanted to leave determination of supply and first-sale price to the market.

*Id.* at 422, 106 S.Ct. at 717.

In actuality, the issue which El Paso raises as to federal pre-emption versus freedom of contract has long been settled: "Neither the NGPA nor the NGA expressly preempt the application of state contract law to the interpretation of gas purchase contracts." *Pennzoil Co. v. FERC*, 645 F.2d 360, 384 (5th Cir.1981); *see also Tenneco Oil Co. v. El Paso Natural Gas*, 687 P.2d 1049 (Okla.1984), and *International Minerals & Chem. Corp. v. Llano*, 770 F.2d 879 (10th Cir.1985) *cert. denied*, 475

---

7. 15 U.S.C. §§ 717 to –717z (1982) and 15 U.S.C. §§ 3301 to –3432 (1982), respectively.

U.S. 1015, 106 S.Ct. 1196, 89 L.Ed.2d 310 (1986) (presumption of freedom of contract under state law without interference either by FERC's regulations or restraints imposed by the NGA or the NGPA). *Cf. Associated Gas Distribs. v. FERC,* 824 F.2d 981, 1025–26 (D.C.Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988) (where, although the court disagreed with FERC's reasoning as to issuance of its Order No. 436,[8] it did nothing to limit the private contract prerogatives of either pipelines or producers).

As we held in *Ashlock v. Sunwest Bank of Roswell,* 107 N.M. 100, 103, 753 P.2d 346, 349 (1988), so too here, we hold that state (contract) law and federal regulation are not in conflict, and thus there is no pre-emption by any applicable federal statute.

## B. DID THE TRIAL COURT ERR IN STRIKING EL PASO'S AFFIRMATIVE DEFENSES? OUR DECISION: NO.

As to this issue, we agree with the reasoning employed by the court in granting summary judgment in *Thomas N. Berry & Co. v. Northern Natural Gas Co.,* No. CIV–85–1430–R (W.D.Okla. May 15, 1986):

> [T]he defendant seems to labor under the misconception that it is the plaintiff's burden not only to prove its prima facie case, * * * but also to prove that the defendant has no affirmative defenses. Consequently, as the defendant has failed to submit any credible evidence to show issues of material fact exist as to [its] defenses, summary judgment will be granted to them * * *.

El Paso is right to argue on appeal that "[s]ummary judgment is a drastic remedy to be used with great caution." *Pharmaseal Laboratories, Inc. v. Goffe,* 90 N.M. 753, 756, 568 P.2d 589, 592 (1977). Here, however, the court cautiously and prudently applied the drastic remedy that was needed.

Trial courts have consistently struck down defenses which have no basis in either fact or law, as was the case here. See *International Minerals & Chem. Corp.,* holding in a natural gas seller's favor on the issue of a *force majeure* clause, where a buyer complied with a regulation of the New Mexico Environmental Improvement Board requiring the seller to shut down certain parts of its potash processing facility near Carlsbad. The buyer unsuccessfully sought a declaratory judgment in the United States District Court for the District of New Mexico, asking to be excused from its performance under the contract with the seller because of the *force majeure* clause. The United States Court of Appeals for the Tenth Circuit agreed with the trial court on the issue of *force majeure,* but reversed the trial court's decision because "there was no technically suitable way for [the plaintiff] to comply with [the state's regulation] without *shutting down* * * *" its operation. 770 F.2d at 887 (emphasis added). In the case before us, the shoe is on the other foot. It is Hartman who is being "shut down," not El Paso, and by El Paso's actions.

 The *force majeure* clauses of the pertinent contracts before us may not be sanctioned when used to force a producer into submitting to a seller's scheme and compel him to do business only on the seller's terms, as was the case here. The Supreme Court has taken a similar approach in *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983), wherein it held that a Kansas statute regulating the price of natural gas in a buy-sell agreement entered into between a Kansas public utility and an energy company did not void the parties' contractual obligations. *See also Exxon Corp. v. Eagerton,* 462 U.S. 176, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983).

As the United States Court of Appeals for the Seventh Circuit has ruled:

---

**8.** For Order No. 436, see 50 Fed.Reg. 42,408 (1985). In this case FERC's order was vacated and remanded for further proceedings because FERC inadequately addressed itself to "take-or-pay" problems raised by the issues before it. Footnote 25 of the decision, however, notes, "No party here presents any argument for a view that FERC could exercise its § 5 power to modify nonjurisdictional wellhead contracts." *Associated Gas Distributors* at 1022. The contracts at issue in the case before us are purely and simply "nonjurisdictional wellhead contracts."

Since impossibility and related doctrines are devices for shifting risk in accordance with the parties' presumed intentions, which are to minimize the costs of contract performance, one of which is the disutility created by risk, they have no place when the contract explicitly assigns a particular risk to one party or the other.

*Northern Indiana Pub. Serv. Co. v. Carbon County Coal Co.*, 799 F.2d 265, 278 (7th Cir.1986). We likewise agree with the court in *Resources Investment Corp. v. Enron Corp.*, 669 F.Supp. 1038, 1043 (D.Colo.1987), when it ruled:

> [T]he parties clearly contemplated the likelihood of changing economic conditions, including alterations in fuel price levels "and such fluctuation was not the kind of completely unforeseeable event required to invoke the doctrine of frustration of purpose," [*United States of America v. Great Plains Gasification Associates, et al.*, 819 F.2d 831 (8th Cir. 1987)] at p. 835. "This court will not hold a contract to be frustrated merely because of an increase in cost to one of the parties." *Ross Industries v. M/V Gretke Oldendorff*, 483 F.Supp. 195, 199–200 (E.D.Tex.1980).... Similar considerations govern the claim based upon impossibility and commercial impracticability.

In the case before us, the affirmative defenses were devoid of any real contact with the facts, and the trial court prudently struck them from the case. If there was any risk to be assumed, it was El Paso which assumed it.

## C. DID THE TRIAL COURT LACK SUBJECT MATTER JURISDICTION IN MAKING FACTUAL DETERMINATIONS AS TO CERTAIN MATTERS INVOLVING OCD REGULATIONS? OUR DECISION: NO.

■ In its brief-in-chief, El Paso claimed the trial court "committed fundamental error by intruding into an area within the exclusive jurisdiction of the New Mexico OCD. This occurred when the court considered Hartman's claim that the process established by the OCD for setting allow-ables under its proration scheme is no longer effective, when it adjudicated the reliability of the OCD system of nominations and allowables, and when it altered subsequent allowables without taking into account any of the factors required by statute or OCD regulations to be considered in setting allowables in order to conserve natural resources and prevent waste." The problem with this contention is that the trial court did none of the things of which El Paso accuses it. The trial court never ruled that OCD's system "is no longer effective." Nor did the trial court take any action to "adjudicate the reliability of the OCD system." Finally, it was El Paso, and not the trial court, which "altered allow-ables" through its manipulation of the market.

We take El Paso's contention on this issue to be a variety of the public rights vs. private. rights argument resolved by the Supreme Court of Oklahoma in *Tenneco Oil Co. v. El Paso Natural Gas Co.* Quoting from *Northern Pipeline Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the court stated:

> [I]t suffices to observe that *a matter of public rights must at a minimum arise "between the government and others."* In contrast, *"the liability of one individual to another under the law as defined," is a matter of private rights * * *. Private-rights disputes * * * lie at the core of the historically recognized judicial power.*

687 P.2d at 1053–1054 (emphasis in original).

The case before us is not one involving "the government and others." It is a contract case, involving a private individual and a corporation. The trial court did not infringe on the jurisdiction of the OCD.

## D. DID THE TRIAL COURT ERR IN RULING THAT EL PASO HAD WAIVED ATTORNEY–CLIENT PRIVILEGE AND WORK–PRODUCT IMMUNITY INSOFAR AS THE DISPUTED DOCUMENTS ARE CONCERNED? OUR DECISION: NO.

■ This is an issue of first impression in New Mexico. We take as our starting

point the principle stated by the United States Court of Appeals for the Second Circuit: "It is axiomatic that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship." *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 144 (2nd Cir.), *cert. denied*, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987).

El Paso argues its point by way of analogy to contract law, asserting the equitable defense of mistake of fact, in that it *inadvertently* produced two of the allegedly protected documents before the court ordered it to produce the others. *See Albuquerque Nat'l Bank v. Albuquerque Ranch Estates, Inc.*, 99 N.M. 95, 654 P.2d 548 (1982); *Talley v. Sec. Serv. Corp.*, 99 N.M. 702, 663 P.2d 361 (1983). El Paso bases its argument in favor of a rule supporting its position on a case that is frequently cited as foundational on this issue, *Mendenhall v. Barber–Greene Co.*, 531 F.Supp. 951 (N.D.Ill.1982), where the court held that counsel's inadvertent production of privileged letters to its adversary in a patent infringement action did not constitute waiver of the attorney-client privilege.

We disagree with El Paso that the rule in *Mendenhall v. Barber–Greene Co.* should be the New Mexico rule governing this issue. Instead, we favor the approach taken by the court in *Hartford Fire Insurance Co. v. Garvey*, 109 F.R.D. 323 (N.D. Cal.1985). There the court spoke of the rule in *Mendenhall* as being of weak precedential value and not the majority rule. *Id.* at 329. Our study of this issue persuades us that the court in *Hartford Fire Insurance Co. v. Garvey* was right in its assessment:

> [T]he modern trend seems to be towards a case by case determination of waiver based on a consideration of all circumstances. The majority of cases do hold, or take for granted, that inadvertent disclosure of privileged documents may waive the privilege. * * * The "inadvertence" of the production is considered

as one factor in determining whether there has been a waiver.

*Id.* at 329–30 (citations omitted).

The court in *Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc.*, 116 F.R.D. 46 (M.D.N. C.1987), while not extending the waiver of privilege to documents not already inadvertently produced, described the general principle behind the modern trend, as follows:

> Notwithstanding its ancient roots and modern necessity, the [attorney-client] privilege must be strictly construed to ensure that it does not unduly impinge on the more general, overriding duty of insisting that investigations and decisions be based on truth and reality as opposed to fiction or fabrication.

*Id.* at 49 (citation omitted).

■ The court then listed five factors which should assist a court in determining whether a document has lost its privilege:

> (1) The reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production; (2) the number of inadvertent disclosures; (3) the extent of the disclosure; (4) any delay and measures taken to rectify the disclosures; (5) whether the overriding interests of justice would be served by relieving a party of its error.

*Id.* at 50.

When measuring El Paso's conduct by these factors, we find its conduct lacking. Therefore, we hold that the trial court did not abuse its discretion in ordering El Paso to produce the documents.

■ The above criteria pertain both to the trial court's determination of the issue of attorney-client privilege as well as to its determination of the issue of work-product immunity. *See Hartford Fire Ins. Co.*, 109 F.R.D. at 327. As for the *additional* documents ordered to be produced, we conclude that the two inadvertently produced documents were sufficient in and of themselves to substantiate Hartman's allegations concerning the subject matter of those documents. Hence, since the cat was

already out of the bag, as far as the jury's knowledge of El Paso's conduct is concerned, it was not prejudicial to El Paso's case for the trial court to order production of the additional documents.

## PART FOUR: CONCLUSION AND SUMMARY OF OUR HOLDING ON APPEAL

To summarize, we affirm the trial court's judgment on the verdict, and order El Paso to comply strictly, in detail and in good faith, with the trial court's permanent injunction.

IT IS SO ORDERED.

SCARBOROUGH, C.J., and STOWERS, J., concur.