GOLD STANDARD, INC., Plaintiff and Appellant,

v.

AMERICAN BARRICK RESOURCES CORPORATION; Barrick Mercur Gold Mines, Inc.; Texaco, Inc.; Getty Oil Company; Getty Mining Company; Getty Gold Mine Company; and John Does 1 through 10, Defendants and Appellees.

No. 890205.

Supreme Court of Utah.

Sept. 21, 1990.

Rehearing Denied Feb. 11, 1991.

James S. Lowrie, Christopher L. Burton, George W. Pratt, James W. Peters, Salt Lake City, for Gold Standard, Inc.

Stephen G. Crockett, Robert S. Clark, Jill N. Parrish, Brian J. Romriell, Salt Lake City, for Texaco, Inc., Getty Oil Co., and Getty Min. Co.

Gordon L. Roberts, Francis M. Wikstrom, Salt Lake City, for American Barrick Resources Corp.

STEWART, Justice:

Plaintiff Gold Standard, Inc., obtained interlocutory review of a district court order holding that Gold Standard could make no further use during discovery of two documents of Getty Oil Company and Getty Mining Company because they were subject to the work product privilege. We hold that the documents are not subject to the work product privilege and that even if

they were, Getty waived its right to assert that privilege.

## I. FACTUAL BACKGROUND

In December 1973, Getty and Gold Standard entered into a joint operating agreement for the development of the Mercur mine in Tooele County, Utah. Getty, as senior partner, held a 75 percent interest in the venture; Gold Standard held a 25 percent participating interest. Under the terms of the agreement, both parties were to pay for a feasibility study during the exploration phase, Phase I, of the project. The purpose of the feasibility study, ostensibly conducted by Bechtel Incorporated, was to determine whether continued development was economically feasible. Upon completion of the feasibility study, which would mark the end of Phase I, Gold Standard was to present the study to financial institutions to finance its interest in the mine during Phase II.

On October 1, 1980, one month before the completion of the feasibility study, Getty transferred its offices for the management of the Mercur mine from Los Angeles to Salt Lake City. The following spring, Getty presented a Bechtel engineering study to Gold Standard, claiming that it formed the necessary feasibility study under the terms of the operating agreement. Although Gold Standard asserts that it did not accept the Bechtel study as the final feasibility study, it paid its portion of the cost.

Both parties proceeded with the development of the mine in 1981, but Gold Standard was unable to finance its interest in the mine. Gold Standard blames this failure on the inadequacy of the Bechtel study as a feasibility study. Under the terms of the operating agreement, Gold Standard's 25 percent interest was converted into a 15 percent net profits interest because it failed to meet the expenses required of it for Phase II. The Mercur mine began production in 1983. In February 1984, defendant Texaco, Inc., acquired the interest of Getty and Getty Mining Co. in the Mercur mine.

On June 28, 1984, Gold Standard President Scott Smith sent a letter to Willis B. Reals, Texaco's senior Vice President, explaining the problems Gold Standard had encountered with Getty with respect to the feasibility study. Smith's letter included a letter dated September 20, 1983, from Gold Standard attorney Robert S. McConnell to Smith. The McConnell letter addressed the alleged unfairness of Getty's prior conduct. Immediately after receiving the letter, Reals wrote to Getty Mining President H.E. Wendt and asked Wendt for his reaction to the Smith letter and for legal advice. Wendt in turn contacted John M. Mintz, Getty's mining manager, for information to formulate a response.

The first of two disputed memoranda was written July 13, 1984, when Charles Kundert, Getty's Los Angeles engineering manager, responded to Mintz's request to review the Mercur-related records in Los Angeles. Kundert wrote that he knew of no feasibility study completed before the spring of 1981. Getty had submitted the Bechtel study as the feasibility study sometime in the spring of 1981.

The second disputed memorandum, a letter from Mintz to Wendt, was written in response to the Kundert memorandum. On July 16, 1984, Mintz sent a letter to Wendt which stated that he could not find a feasibility study for the Mercur mine in Getty's data room index. The Kundert memorandum was included in Mintz's letter to Wendt. Despite this information, Wendt wrote directly to Gold Standard's Smith on October 25, 1984, and referred to Gold Standard's claim of unfairness as a "lame excuse" because Phase II had been under development for four years with Gold Standard's consent.

During the summer of 1985, defendant American Barrick Resources Corporation ("Barrick"), not a party to this appeal, acquired Texaco's interest in the Getty mine. In December 1986, Gold Standard filed its complaint against defendants, claiming, inter alia, that Getty had breached the operating agreement by not providing a proper

feasibility study.[1]

In early 1987, Richard Klatt, a former Getty project geologist, delivered the Kundert and Mintz memoranda, the two disputed documents, to Gold Standard. Klatt had copied the memoranda for his personal Mercur file while working in Getty's Los Angeles office. The memoranda were part of a general, nonconfidential reading file which was circulated weekly through Getty's exploration offices in Los Angeles in 1984. Klatt took copies of the memoranda with him when he left Getty's employment. On June 1, 1987, during a meeting with Gold Standard, Kundert signed an affidavit discussing the circumstances surrounding the writing of his memorandum to Mintz, and in September 1987, Getty received a copy of Kundert's affidavit, with the Kundert and Mintz documents, and learned of Klatt's prior ex parte contact with Gold Standard. Getty did not at that time raise any issue as to whether the work product privilege concerned those memoranda.

On December 2, 1987, during Gold Standard's deposition of Kundert, Gold Standard marked the memoranda and had them appended as exhibits to the deposition. Getty's counsel asked Kundert if he knew whether the memoranda had been requested by Mintz's attorney. Kundert responded that he had merely responded to a management inquiry by Mintz. Again, Getty raised no work product issue during the deposition.

In late 1987 or early 1988, Getty delivered the memoranda to Gold Standard under Gold Standard's demand for document production, and the memoranda were again used during four subsequent depositions by Gold Standard. Getty, however, did not mention the work product issue until June 15, 1988, during the deposition of H.E. Wendt, Getty Mining Co. president.

Some eight months after Getty had produced the memoranda during the discovery process, and a year after it knew the memoranda were in Gold Standard's possession and had been used in five different depositions, Getty filed a motion for a protective order on September 26, 1988. In its motion, Getty asserted (1) the memoranda were subject to the work product privilege; and (2) it had not waived the work product privilege. Getty asked the court to order Gold Standard to return all copies of the memoranda and prohibit Gold Standard from using the memoranda during discovery. The trial court granted Getty's motion and ruled that (1) the memoranda were work product prepared in anticipation of litigation; (2) Getty had not waived its right to assert the work product doctrine because it had taken reasonable precautions to prevent inadvertent disclosure and had not acted in a dilatory manner when seeking the return of the documents; and (3) the work product doctrine applied even though Gold Standard had obtained copies of the memoranda through means other than the formal discovery process. The trial court ordered Gold Standard to return all copies of the memoranda to Getty and return Klatt's originals to him and prohibited the further use of the memoranda in the discovery process. This Court granted Gold Standard's petition for an interlocutory appeal of that order.

## II. WORK PRODUCT

The genesis of the current work product doctrine is *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The Supreme Court held that an attorney could refuse to produce during discovery documents containing statements he had obtained from witnesses. The "work product" of the attorney was not discoverable absent a showing of substantial need. The Court stated: "Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney." 329 U.S. at 510, 67 S.Ct. at 398. The underlying theme of *Hickman* is the preservation of the adversarial system by the protection of the privacy of an attorney's files prepared in anticipation of litigation from encroachments of opposing counsel. 4 J. Moore, J. Lucas,

---

1. Gold Standard has also asserted numerous other claims, all of which concern the operation or sale of the mine, against Getty, Texaco, and American Barrick Resources.

& G. Grotheer, *Federal Practice*, ¶ 26.64[4], at 26–390 (2d ed. 1989).

In 1970, the *Hickman* doctrine was made a part of the Federal Rules of Civil Procedure in Rule 26(b)(3). The relevant portion of Rule 26(b)(3) states:

(3) **Trial preparation: Materials.** Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Rule 26(b)(3) of the Utah Rules of Civil Procedure is nearly identical to the federal rule. In construing our rule, we freely refer to authorities which have interpreted the federal rule. *Allen Steel Co. v. Crossroads Plaza Assocs.*, 119 Utah Adv.Rep. 6, —— P.2d —— (Utah 1989); *Olson v. Salt Lake City School Dist.*, 724 P.2d 960, 965 n. 5 (Utah 1986); *Pate v. Marathon Steel Co.*, 692 P.2d 765, 767 n. 1 (Utah 1984).

■ For written materials to fall under the protection of Rule 26(b)(3), three criteria must be met: (1) the material must be documents and tangible things otherwise discoverable, (2) prepared in anticipation of litigation or for trial, (3) by or for another party or by or for that party's representative. *City Consumer Servs., Inc. v. Horne*, 100 F.R.D. 740, 747 (D.Utah 1983); 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2024, at 196–97 (1970). However, even if these requirements are met, the privilege does not apply if the party seeking discovery can show a need for the information and that it cannot be obtained without substantial hardship. Utah R.Civ.P. 26(b)(3); *Langdon v. Champion*, 752 P.2d 999, 1005 (Alaska 1988). But if the documents convey the mental impressions, conclusions, opinions or legal theories of an attorney or party, the documents will be afforded heightened protection as "opinion work product." Utah R.Civ.P. 26(b)(3). *See Toledo Edison Co. v. G.A. Technologies, Inc.*, 847 F.2d 335, 339–40 (6th Cir.1988).

In its memorandum decision, the trial court simply ruled, without further elaboration, that "the documents in question are work product prepared in anticipation of litigation." Gold Standard contests that conclusion on the ground that an attorney must have been involved in the creation of the memoranda for them to be protected as work product. Although Getty's in-house counsel was aware that Getty was preparing a response to Gold Standard's initial letter, the attorney did not request the response, nor did he assist in its preparation. Nothing in the record suggests that the Getty attorney had any knowledge of the Mintz investigation or that the attorney had any contact with either Mintz or Kundert, the management-level Getty employees who prepared the two memoranda. There is no indication that the Getty in-house attorney even saw the memoranda.

■ Since Getty's attorney had no involvement in the preparation of the memoranda, the memoranda cannot be treated as work product, according to Gold Standard. *See Thomas Organ Co. v. Jadranska Slobodna Plovidba*, 54 F.R.D. 367, 372 (N.D. Ill.1972). Getty responds that attorney involvement is only one factor for the court to consider in determining whether a document was created in anticipation of litigation. *See Hawkins v. District Court, Fourth Judicial Dist.*, 638 P.2d 1372, 1377 n. 4 (Colo.1982). We agree that attorney involvement is only a factor to be weighed in reaching the ultimate conclusion.

*Hickman* did not address the issue of attorney involvement since the facts of that

case dealt with statements taken by a lawyer. *Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery,* 48 F.R.D. 487, 499, 501 (advisory committee's note) (1970) [hereinafter "Advisory Committee's Note"]; *United States v. Nobles,* 422 U.S. 225, 239 n. 13, 95 S.Ct. 2160, 2170 n. 13, 45 L.Ed.2d 141 (1975). But after *Hickman,* the courts disputed whether the work product doctrine extended to trial preparation work by non-lawyers. Advisory Committee's Note, 48 F.R.D. at 499, 501; 8 C. Wright & A. Miller, *Federal Practice & Procedure* § 2024 at 202–03 (1970). The 1970 codification of the work product privilege in Rule 26(b)(3) ended the dispute by specifically including in the privilege material prepared "by or for another party or by or for that other party's representative." Fed.R. Civ.P. 26(b)(3); Advisory Committee's Note, 48 F.R.D. at 502; *Moore v. Tri–City Hosp. Auth.,* 118 F.R.D. 646, 649 (N.D.Ga. 1988); *Mullins v. Vakili,* 506 A.2d 192, 195 (Del.Super.Ct.1986); *Eoppolo v. National R.R. Passenger Corp.,* 108 F.R.D. 292, 295 (E.D.Pa.1985). Thus, the plain language of the rule does not require that an attorney be involved in the preparation of the material. 8 C. Wright & A. Miller, *Federal Practice & Procedure* § 2024, at 205–07 (1970); *Toledo Edison Co. v. G.A. Technologies, Inc.,* 847 F.2d 335 (6th Cir.1988); *Duplan Corp. v. Deering Milliken, Inc.,* 540 F.2d 1215, 1219 (4th Cir.1976); *Scott Paper Co. v. Ceilcote Co.,* 103 F.R.D. 591, 594 (D.Me.1984); *Thomas Organ Co. v. Jadranska Slobodna Plovidba,* 54 F.R.D. 367, 370 (N.D.Ill.1972); *Hawkins v. District Court, Fourth Judicial Dist.,* 638 P.2d 1372, 1376–77 (Colo.1982).

Nevertheless, some courts have held that attorney involvement is required to show that the document was prepared in anticipation of litigation and not in the ordinary course of business. *McDougall v. Dunn,* 468 F.2d 468 (4th Cir.1972); *Thomas Organ,* 54 F.R.D. at 372; *Langdon v. Champion,* 752 P.2d 999 (Alaska 1988); *Henry Enterprises, Inc. v. Smith,* 225 Kan. 615, 592 P.2d 915 (1979). The court in *Thomas Organ* stated:

*[A]ny* report or statement made by or to a party's agent (other than to an attorney acting in the role of counsellor), which has not been requested by nor prepared for an attorney nor which otherwise reflects the employment of an attorney's legal expertise must be conclusively presumed to have been made in the ordinary course of business and thus not within the purview of the limited privilege of new Rule 26(b)(3)....

54 F.R.D. at 372 (emphasis in original).

Other courts have rejected the strict approach of *Thomas Organ* and have used attorney involvement as only one factor in a more fact-specific determination of whether material was prepared in anticipation of litigation. *Basinger v. Glacier Carriers, Inc.,* 107 F.R.D. 771, 773–74 (M.D.Pa.1985); *Scott Paper Co. v. Ceilcote Co.,* 103 F.R.D. 591, 594 (D.Me.1984); *APL Corp. v. Aetna Casualty & Sur. Co.,* 91 F.R.D. 10, 18 (D.Md.1980); *Spaulding v. Denton,* 68 F.R.D. 342, 345 (D.Del.1975); *Mullins,* 506 A.2d at 195–96; *Hawkins,* 638 P.2d at 1377 n. 4; Note, *Work Product Discovery: A Multifactor Approach to the Anticipation of Litigation Requirement in Federal Rule of Civil Procedure 26(b)(3),* 66 Iowa L.Rev. 1277, 1287 (1981).

The rule that better effectuates the language of Rule 26(b)(3), and its underlying rationale, is that attorney involvement is only one factor to be weighed in determining the applicability of the work product privilege. *See Moore v. Tri–City Hosp. Auth.,* 118 F.R.D. 646 (N.D.Ga.1988); 8 C. Wright & A. Miller, *Federal Practice & Procedure* § 2024, at 207 (1970). Moreover, the leading treatises have rejected the *Thomas Organ* approach. 4 J. Moore, J. Lucas, & G. Grotheer, *Moore's Federal Practice* ¶ 26.64[2], at 26–360 n. 23 (2d ed. 1989); 8 C. Wright & A. Miller, *Federal Practice & Procedure* § 2024, at 205–06 (1970).

 Nevertheless, the fact that no attorney was involved may suggest that a document was prepared in the ordinary course of business and not in anticipation of litigation. *See generally Thomas Organ.* But here, there is no indication that

Getty's counsel knew either Kundert or Mintz; nor is there any indication he was aware of their preparation of the memoranda. Clearly, there is no evidence that counsel helped to prepare the documents or had any input into the preparation of the documents. Nor is there evidence that he saw the memoranda at the time they were prepared. That the memoranda were written solely at the insistence of management-level employees and with no attorney request or other attorney involvement is strongly persuasive that the memoranda were not prepared in anticipation of litigation.

 Furthermore, the evidence is clear that the two memoranda were not prepared "in anticipation of litigation or for trial," and do not satisfy the second element of the work product test, apart from the issue of the attorney's role. An inquiry to determine whether a document was prepared in anticipation of litigation should focus on the " 'primary motivating purpose behind the creation of the document.' " *United States v. Gulf Oil Corp.*, 760 F.2d 292, 296 (Temp.Emer.Ct.App.1985) (quoting *United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir.1981)). Under this standard, "if the primary purpose behind the creation of the document is not to assist in pending or impending litigation," then work product protection is not justified. *Gulf Oil Corp.*, 760 F.2d at 296. The mere possibility that litigation may occur or even "the mere fact that litigation does eventually ensue" is insufficient to cloak materials with the mantle of work product protection. *Binks Mfg. Co. v. National Presto Indus., Inc.*, 709 F.2d 1109, 1118 (7th Cir.1983); *see also Janicker v. George Washington Univ.*, 94 F.R.D. 648, 650 (D.D.C.1982); *Soeder v. General Dynamics Corp.*, 90 F.R.D. 253, 255 (D.Nev.1980).

 The trial court held that the memoranda were prepared in anticipation of litigation. Mintz's affidavit states that he was told that "Gold Standard was unhappy with the way the project had ended up from their standpoint, and was threatening litigation." Yet the event that all parties agree precipitated the writing of the Mintz and Kundert memoranda, Smith's June 28, 1984 letter to Texaco Vice President Reals does not refer to a threat of litigation. The letter states, in pertinent part:

Gold Standard is still of the view that, as a legal matter, the "feasibility study" which is contemplated by the above-quoted portions of our Agreement with Getty means, and was intended by the parties to mean, a final outside third party, independent feasibility study, one which would be acceptable by the SEC and by the various investment and commercial bankers as sufficient to support estimates of ore reserves, etc. and upon which statements with respect to technical and economical practicability of the project could be supported. As we see it, Getty Mining Company has failed to provide Gold Standard with such a "feasibility study" as specified by the Operating Agreement, and, legally speaking, the parties are still in "Phase I" under that Agreement. Our views in this regard are well supported by widely accepted published material, banking and other lending institutions, the majors in the mining industry, and a large body of independent mining and financial authorities.

My reason for the foregoing is to advise you of the major problems which exist between Getty Mining and Gold Standard, because we believe these do affect both the worth and sal[e]ability of the Mercur property. Further, we suspect that you might have a legal disclosure responsibility here, and therefore should know the facts as we see them.

Smith's letter also contains an expression of interest in the purchase of the mine and a desire to negotiate toward that end. Gold Standard's lawsuit was filed in December 1986, two-and-a-half years after Smith's letter.

 In short, the Mintz and Kundert memoranda were not written to "assist in pending or impending litigation." Generally, a letter whose tone is "threatening" but does not state an intent to pursue litigation is insufficient to allow a party to invoke work product protection to protect an in-house report prompted by the letter.

*Binks Mfg. Co.*, 709 F.2d at 1120. That rule applies here. Smith's letter addresses wrongs perceived by Gold Standard, but it does not threaten litigation. In fact, the letter expresses Gold Standard's interest in purchasing the Mercur mine.

The Mintz and Kundert memoranda apparently were written as part of a Getty investigation, prompted by Texaco, to determine whether a feasibility study had been performed. They fall squarely within the holding of *Janicker v. George Washington Univ.*, 94 F.R.D. 648, 650 (D.D.C. 1982): "If in connection with an accident or an event, a business entity in the ordinary course of business conducts an investigation for its own purposes, the resulting investigative report is produceable in civil pre-trial discovery." *See also Binks Mfg. Co.*, 709 F.2d at 1118–21; *Scott Paper Co. v. Ceilcote Co.*, 103 F.R.D. 591 (D.Me.1984).

In sum, the memoranda are not work product. They were not prepared by an attorney or at the request of an attorney or by someone doing litigation investigation at the request of an attorney; nor were they otherwise prepared to assist in litigation.

## III. WAIVER

Gold Standard also argues that Getty waived its work product protection. The trial court held that Getty did not waive its right to assert the privilege either by its own inadvertent disclosure of the documents or by the disclosure of the documents by a former employee. The trial court also held that Getty was not dilatory in asserting its rights. We disagree.

Courts which have dealt with the waiver issue have generally followed one of two lines of analysis. One focuses on the intent of the disclosing party in determining whether waiver has occurred. The other disregards the disclosing party's intent as irrelevant and focuses on the result of the disclosure. If the adverse party has possession of the material, the privilege is waived. We need not now adhere to one or the other position, since under both approaches Getty waived the privilege.

Getty argues that it produced the memoranda inadvertently and that an inadvertent disclosure does not eliminate work product protection. It relies on *Mendenhall v. Barber–Greene Co.*, 531 F.Supp. 951 (N.D.Ill.1982). A majority of cases, however, either hold or assume that, depending on the circumstances, inadvertent disclosure waives the work product privilege. *Hartford Fire Ins. Co. v. Garvey*, 109 F.R.D. 323, 329 (N.D.Cal.1985). *Hartford* addresses waiver issues under both attorney-client and work product rationales, adopts the case-by-case analysis set forth in *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 104 F.R.D. 103 (S.D.N.Y.1985), *aff'd*, 799 F.2d 867 (2d Cir.1986), and delineates five elements to determine whether a disclosure constitutes waiver:

> 1) the reasonableness of the precautions to prevent inadvertent disclosure; 2) the time taken to rectify the error; 3) the scope of the discovery; 4) the extent of the disclosure; and 5) the "overreaching issue of fairness."

104 F.R.D. at 105. Although *Lois Sportswear* addresses waiver of the attorney-client privilege, the analysis also applies to instances of work product waiver. *Hartford Fire Ins. Co.* at 328. The distinction between the two doctrines disappears when the issue is disclosure to the adverse party. *Id. See also Hartman v. El Paso Natural Gas Co.*, 107 N.M. 679, 763 P.2d 1144 (1988).

Getty knew that Gold Standard had the memoranda in September 1987. Gold Standard obtained the memoranda from a former Getty employee who had copies of the memoranda for legitimate reasons. Getty also voluntarily produced the memoranda in late 1987 or early 1988 in response to Gold Standard's demand for production of documents. The memoranda were used during five different depositions, beginning with the deposition of Charles Kundert on December 2, 1987. Getty voluntarily produced the memoranda soon after the initial deposition, and the memoranda were subsequently used by Gold Standard during the depositions of Robert M. Smith, president of American Barrick, in April 1988; Willis B. Reals on June 14, 1988; John Tumazos,

taken in a related action by Barrick against Gold Standard in New York on June 15, 1988; and H.E. Wendt on June 15, 1988. Despite this open and widespread use of the memoranda, Getty did not file a motion for a protective order until September 26, 1988, a full year after it knew that Gold Standard had the memoranda and three months after their last use.

The facts demonstrate much more than inadvertent disclosure, assuming that inadvertent disclosure, by itself, is not enough to constitute waiver. Getty, in effect, ratified plaintiff's use of the memoranda when it failed to assert any work product claims during the numerous depositions which were taken during the summer of 1988. At least eight months passed from the time Getty disclosed the documents to Gold Standard and the time it filed a motion for a protective order. Getty exhibited no discernible expedition in retrieving the memoranda. Gold Standard has used the memoranda as a cornerstone for its breach of contract claim, and it has used the memoranda extensively throughout discovery.

■ A number of courts have declined to apply a strict "inadvertent" disclosure doctrine in waiver cases and instead have examined intent and precautions of the disclosing party in trying to maintain confidentiality. *E.g., International Digital Systems v. Digital Equipment Corp.*, 120 F.R.D. 445 (D.Mass.1988). According to this view, work product protection is waived when disclosure "substantially increases the opportunity for potential adversaries to obtain the information." *Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.*, 125 F.R.D. 578, 587 (N.D.N.Y. 1989) (citations omitted). That was the case here. The memoranda were disclosed directly to a known adversary during document production. *See* Note, *Waiver of Work Product Immunity*, 1981 U.Ill.L. Rev. 953, 968. Getty allowed the memoranda to become part of a general reading file circulated among its employees without much regard for confidentiality. An employee obtained copies of the memoranda and, some years later, turned them over to Gold Standard.

Under similar circumstances, *United States v. Kelsey–Hayes Wheel Co.*, 15 F.R.D. 461 (E.D.Mich.1954), held that work product protection was waived:

> These particular documents were apparently circulated among the interested officials of [the party] and it does not appear that they resided in ... counsel's work files.... They do not, therefore, qualify for the special protection afforded by that rule. In any event, the cloak of privacy having been voluntarily lifted ..., there is no longer any reason to invoke the rule.

15 F.R.D. at 465.

■ Finally, for a year after Getty knew that Gold Standard had the memoranda and for several months after Getty surrendered the memoranda, Getty did nothing. The memoranda were used time and again in depositions without objection from Getty. Even after a possible objection was noted, Getty waited over three months to file its motion for a protective order. Delay in failing to object and in failing to move for protection calls into question Getty's assertion that the memoranda are work product. The inaction and delay in filing constitute an independent waiver of whatever right Getty may have been able to assert, and the trial judge should have so found. *See, e.g., Shields v. Sturm, Ruger Co.*, 864 F.2d 379, 382 (5th Cir.1989); *Baxter Travenol Laboratories, Inc. v. Abbott Laboratories*, 117 F.R.D. 119, 121 (N.D.Ill.1987) ("Even where initial production may have been inadvertent, however, delay in claiming the privilege can result in waiver."). Getty's failure to demonstrate any diligence whatsoever in asserting the privilege is itself a waiver.

The trial court's order suppressing use of the memoranda is reversed.

HALL, C.J., HOWE, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.