2010 UT App 332

**Larry ROTH, Plaintiff and Appellant,**

v.

**Ronald JOSEPH, M.D.; and Northern Utah Healthcare Corporation dba St. Mark's Hospital, Defendants and Appellees.**

No. 20090716–CA.

Court of Appeals of Utah.

Nov. 26, 2010.

David E. Ross II, Park City, for Appellant.

R. Scott Williams, Peter J. Baxter, Tawni J. Anderson, Eric P. Schoonveld, and Jason Richard Watson, Salt Lake City, for Appellees.

Before Judges ORME, VOROS, and ROTH.

## OPINION

VOROS, Judge:

¶ 1 This medical malpractice case involves two questions, one involving the setting aside of a default certificate, the other the application of the limitations statute. Plaintiff Larry Roth filed a medical malpractice action against Dr. Ronald Joseph and St. Mark's Hospital (the Hospital), alleging that Dr. Joseph negligently failed to clearly identify for the surgeon a spot in Mr. Roth's colon that needed to be resected.[1] Mr. Roth filed his "notice of intent" against Dr. Joseph on May 9, 2007. The trial court determined that Mr. Roth's claim was barred by the statute of limitations because Mr. Roth discovered or should have discovered his legal injury more than two years earlier, not later than January 5, 2005. We affirm.

## BACKGROUND

### 1. Mr. Roth's Surgery

¶ 2 Dr. Joseph performed a colonoscopy on Mr. Roth on April 28, 2004. At that time, he removed a large polyp and several smaller polyps from Mr. Roth's colon. He also tattooed above and below the polypectomy site with tattoo ink. The tattoos were intended to identify the area where the larger polyp had been removed in case a future surgery was needed. In his colonoscopy report, Dr. Joseph described the larger polyp as fifteen centimeters from the anal verge and also stated that it was located in the distal sigmoid colon. The pathology report indicated that the larger polyp was "moderately-differentiated adenocarcinoma" and that "the tumor invades into submucosa and probably touches cauterized surgical margin." Based on this report, Dr. Joseph referred Mr. Roth to Dr. Hugh Voorhees, a general surgeon, for a colon resection.

¶ 3 On May 24, 2004, Dr. Voorhees performed surgery on Mr. Roth to resect his colon. Dr. Voorhees could not see the tattoos that Dr. Joseph had left. During the procedure, Dr. Voorhees attempted without success to contact Dr. Joseph, but he was able to reach Dr. Joseph's partner, Dr. Peder J. Pedersen. Dr. Pedersen went to the operating room to help Dr. Voorhees locate the tattooed polypectomy site. Before Dr. Pedersen arrived, Dr. Voorhees removed a twenty-five-centimeter portion of Mr. Roth's colon that he felt was the "most likely area." When Dr. Pedersen arrived, he too looked for the tattoos but could not find them. After surgery, Dr. Voorhees told Mr. Roth that he could not find the tattooed polypectomy site, but "he felt comfortable that they got everything anyway."

¶ 4 On October 13, 2004, Mr. Roth had a follow-up visit with Dr. Joseph. Dr. Joseph did another colonoscopy and found that Dr. Voorhees had not removed the relevant section of the colon. According to Mr. Roth's affidavit, "Dr. Joseph ... express[ed] shock and surprise ... that the polypectomy site remained intact and [led Mr. Roth to believe] that [Dr. Joseph] had no idea that Dr. Voorhees did not resect the polypectomy." Dr. Joseph referred Mr. Roth to the University of Utah, where he had yet another colonoscopy on November 8, 2004. The surgeon there found two tattoos identifying the April 28

---

1. "Resection" means "the surgical removal of part of an organ or structure." *Merriam Webster's Collegiate Dictionary* 1059 (11th ed. 2004).

polypectomy site. Mr. Roth was awake during this procedure and heard the doctors discussing the scar and the tattoos. On January 24, 2005, Mr. Roth underwent surgery yet again. Pathology results indicated that this surgery successfully removed the polypectomy site originally identified on April 28, 2004, by Dr. Joseph. The pathology studies revealed no malignancies.

### 2. Mr. Roth's Pursuit of His Claim

¶ 5 On January 5, 2005, Mr. Roth obtained his medical file from Dr. Voorhees and Dr. Joseph. That file included a note made by Dr. Voorhees and dated June 8, 2004 (the June 8, 2004 note), summarizing the May 24 surgery:

> [Mr. Roth] underwent sigmoid colectomy with low anterior resection on 5/24/04.... Dr. Ron Joseph had injected dye upstream and downstream but at the time of surgery was identified [sic]. A colonoscopy was requested during surgery and again, no dye was identified. I removed the area in question.... This is disconcerting because the area of previous biopsy is still not positively identified. Apparently, the new dye that they are using rather than the India ink has equivocal results. They are looking into that and ways of changing the tattooing that is being done....

¶ 6 The parties disagree as to whether the medical file also included a letter from Dr. Voorhees to Dr. Joseph. Dr. Voorhees insists that it did, but Mr. Roth maintains that this letter was not in his medical file when he received the file. The letter restated the fact that Dr. Voorhees found no dye during his resection.

¶ 7 On May 24, 2006, Mr. Roth filed a notice of intent against Dr. Voorhees. In that arbitration proceeding, separate from this lawsuit, Mr. Roth did not name Dr. Joseph. In January 2007, Dr. Joseph was deposed as a fact witness in the case against Dr. Voorhees. During his deposition, Dr. Joseph indicated that he had experienced difficulty with the brand of tattoo ink he had used on Mr. Roth, including disappearing or fading. Following this deposition, Mr. Roth began pursuing a claim against Dr. Joseph.

¶ 8 Mr. Roth filed his notice of intent against Dr. Joseph on May 9, 2007, nearly a year after the deposition and over two years after receiving his medical file. In July 2007, Mr. Roth deposed Dr. Stephen Porter, who stated that Dr. Joseph's anatomical description of the location of the polypectomy site was in a different location than Dr. Joseph's centimeter description. Dr. Porter described the error as "a train wreck waiting to happen."

### 3. Notice of Default Against the Hospital

¶ 9 Mr. Roth filed suit on January 17, 2008, and served both Dr. Joseph and the Hospital on March 25, 2008. Due to an inadvertent error by a paralegal in the office of the law firm representing the Hospital, the Hospital's answer was calendared as due in forty-five days rather than the thirty days stated in the summons. Consequently, the Hospital filed its answer on May 6, 2008, twelve days late.

¶ 10 Three days before the Hospital filed its answer, the trial court clerk entered a default certificate—but not a default judgment—against the Hospital at Mr. Roth's request. A month later, Mr. Roth moved for a default judgment; a month after that, the Hospital moved to set aside the default certificate and to strike Mr. Roth's motion for default judgment. The trial court granted the Hospital's Motion to Set Aside the Default Certificate, denied Mr. Roth's Motion for Default Judgment, and allowed the Hospital's answer to stand.

¶ 11 The parties exchanged initial discovery, and Mr. Roth was deposed. Dr. Joseph and the Hospital moved for summary judgment on the ground that Mr. Roth's claims were barred by the statute of limitations. *See* Utah Code Ann. § 78B–3–404(1) (2008). The trial court granted summary judgment. Mr. Roth appeals.

## ISSUES AND STANDARDS OF REVIEW

■ ¶ 12 Mr. Roth appeals the trial court's grant of the Hospital's Motion to Set Aside the Default Certificate and denial of his Motion for Default Judgment. We review the trial court's decision to set aside a default for

abuse of discretion. *See Davis v. Goldsworthy* (*Davis I*), 2008 UT App 145, ¶ 10, 184 P.3d 626 (mem.) (citing *Lund v. Brown*, 2000 UT 75, ¶¶ 9–11, 11 P.3d 277).

¶ 13 Mr. Roth also appeals the trial court's grant of summary judgment to Dr. Joseph. He first challenges the trial court's determination that Mr. Roth's claim was barred by the statute of limitations. He also challenges the trial court's conclusion that no genuine issue of material fact existed to support Mr. Roth's claim that Dr. Joseph fraudulently concealed any alleged misconduct. "Because the determination of whether summary judgment is appropriate presents a question of law, we accord no deference to the trial court's decision and instead review it for correctness." *Arnold v. Grigsby*, 2010 UT App 226, ¶ 12, 239 P.3d 294 (internal quotation marks omitted).

## ANALYSIS

### I. Notice of Default

¶ 14 We first consider whether the trial court erred in vacating the default certificate entered against the Hospital. Under rule 55 of the Utah Rules of Civil Procedure, "[f]or good cause shown the court may set aside an entry of default." Utah R. Civ. P. 55(c). Mr. Roth contends that "good cause" has not been shown in this case.

¶ 15 A default certificate is " 'a first step' " towards obtaining a default judgment. *Davis v. Goldsworthy* (*Davis II*), 2010 UT App 78, ¶ 10 n. 4, 233 P.3d 496 (quoting *Davis I*, 2008 UT App 145, ¶ 15 n. 7, 184 P.3d 626). "[A]ll that must be shown for the entry of a default is that the defendant has failed to answer the complaint in a timely fashion." *Skanchy v. Calcados Ortope SA*, 952 P.2d 1071, 1076 (Utah 1998). A trial court may set aside a default judgment only "in accordance with [r]ule 60(b)," but it may set aside a default "[f]or good cause shown." Utah R. Civ. P. 55(c); *see also Calder Bros. v. Anderson*, 652 P.2d 922, 926 n. 4 (Utah 1982).

¶ 16 Factors relevant to whether good cause has been shown could include whether the default was willful, whether the defendant alleges a meritorious defense, whether the defendant acted expeditiously to correct the default, whether setting the default aside would prejudice the plaintiff, and the extent, if any, to which the public interest is implicated. *See Beitel v. OCA, Inc.* (*In re OCA, Inc.*), 551 F.3d 359, 369 (5th Cir.2008) (listing factors); *Miller v. Brocksmith*, 825 P.2d 690, 693 (Utah Ct.App.1992) (noting that, because the state and federal rules are materially identical, " 'we freely refer to authorities which have interpreted the federal rule' " (quoting *Gold Standard, Inc. v. American Barrick Res. Corp.*, 805 P.2d 164, 168 (Utah 1990))).

¶ 17 Speaking of a default *judgment,* our supreme court has stated that a trial court should "incline towards granting relief in a doubtful case to the end that the party may have a hearing." *Lund v. Brown*, 2000 UT 75, ¶ 10, 11 P.3d 277 (internal quotation marks omitted). This is because "if default is issued when a party genuinely is mistaken to a point where, absent such mistake, default would not have occurred, the equity side of the court would grant relief." *May v. Thompson*, 677 P.2d 1109, 1110 (Utah 1984) (per curiam). Thus, " 'it is quite uniformly regarded as an abuse of discretion to refuse to vacate a default judgment where there is a reasonable justification or excuse for the ... failure ... and timely application is made to set it aside.' " *Menzies v. Galetka*, 2006 UT 81, ¶ 63, 150 P.3d 480 (omissions in original) (quoting *Lund*, 2000 UT 75, ¶ 11, 11 P.3d 277). Inasmuch as a default certificate is merely "a first step" towards obtaining a default *judgment, Davis II*, 2010 UT App 78, ¶ 10 n. 4, 233 P.3d 496, we hold that these principles apply a fortiori to appellate review of a trial court's order setting aside a default *certificate.*

¶ 18 The trial court did not abuse its discretion in setting aside the default certificate here. First, the default was not willful. The Hospital's answer was twelve days late due to an inadvertent clerical error on the part of its law firm. Second, the Hospital acted expeditiously to correct the default. The Hospital filed an answer three days after the default was entered and within the forty-five days it had erroneously calendared. It

also moved promptly to set aside the entry of default. Third, Mr. Roth does not assert, nor can we see, that the twelve-day delay resulted in any prejudice. And finally, as explained below, the Hospital had a meritorious defense based on the statute of limitations. Accordingly, we see no abuse of discretion in the trial court's determination of good cause for vacating the default. *See In re OCA, Inc.,* 551 F.3d at 369.

## II. Grant of Summary Judgment

¶ 19 We next turn to the trial court's grant of summary judgment in favor of Dr. Joseph and the Hospital. Summary judgment is appropriate "when there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). "[I]n reviewing a grant of summary judgment, we analyze the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Arnold v. Grigsby,* 2010 UT App 226, ¶ 12, 239 P.3d 294 (alteration in original) (internal quotation marks omitted).

### A. Because Mr. Roth Discovered His Legal Injury at the Latest by January 5, 2005, His Claim is Time-barred.

¶ 20 First, we consider the trial court's conclusion that Mr. Roth's claim was barred by the statute of limitations. The Utah Medical Malpractice Act states that "[a] malpractice action against a health care provider shall be commenced within two years after the plaintiff or patient discovers, or through the use of reasonable diligence should have discovered the injury, whichever first occurs." Utah Code Ann. § 78B-3-404(1) (2008). However, "a plaintiff has not discovered his injury until he is aware that negligence may have caused the injury." *Daniels v. Gamma W. Brachytherapy, LLC,* 2009 UT 66, ¶ 27, 221 P.3d 256 (citing *Deschamps v. Pulley,* 784 P.2d 471, 473 (Utah Ct.App.1989)). Discovering the injury thus includes "discovering the 'injury and the negligence which resulted in the injury,' also referred to as 'legal injury.'" *Id.* ¶ 25 (quoting *Foil v. Ballinger,* 601 P.2d 144, 148 (Utah 1979)).

¶ 21 However, "'a legal determination of negligence is not necessary to start the statute of limitations.'" *Deschamps,* 784 P.2d at 474 (quoting *Hargett v. Limberg,* 598 F.Supp. 152, 155 (D.Utah 1984), *rev'd on other grounds,* 801 F.2d 368 (10th Cir.1986)). "'Rather, the crucial question is whether the plaintiff was aware of the *facts* that would lead a reasonable person to conclude that he may have a cause of action against the health care provider. Those facts include the existence of an injury, its cause and the possibility of negligence.'" *Id.* (quoting *Hargett,* 598 F.Supp. at 155). Otherwise stated, a potential plaintiff "'need not have certain knowledge of negligence in order to have "discovered" it. All that is necessary is that [he or she] be aware of facts that would lead an ordinary person, using reasonable diligence, to conclude that a claim for negligence may exist.'" *Jensen v. IHC Hosps., Inc.,* 2003 UT 51, ¶ 61, 82 P.3d 1076 (quoting Model Utah Jury Instructions § 6.37 (1993)). Thus, to satisfy this prong of the discovery inquiry and trigger the running of the limitations period, a potential plaintiff must "suspect negligence," that is, be aware "that negligence may be the source" of the injury or "its possible cause," or that the health care provider "might have been negligent." *Daniels,* 2009 UT 66, ¶¶ 29–31, 221 P.3d 256.

¶ 22 Medical malpractice claims often, as here, arise in circumstances involving multiple actors, multiple procedures, or both. In such circumstances, the limitations period begins to run when "the patient discovers which medical event allegedly caused [the] injury." *Id.* ¶ 30. In contrast, the patient "may not be required to discover the specific individual responsible for his injury." *Id.* ¶ 29. This is because "[i]n the single-event/multiple-actor circumstance, a patient who is injured and suspects negligence may investigate this suspicion with adequate time to bring a claim based on the facts of that medical treatment." *Id.* This rule also recognizes that to calculate whether two years have passed since an event, the event—but not necessarily the responsible participants—must be identified.

¶ 23 The question in the case at bar is when Mr. Roth discovered or should have

discovered, in his words, the "negligence that caused [his] injury." We agree that generally "[t]he determination of when one discovers or should have discovered his legal injury is a fact-intensive matter for a jury to ascertain." As we recently stated in *Arnold v. Grigsby*, 2010 UT App 226, 239 P.3d 294, "[t]he question of when a plaintiff knew or should have known sufficient facts to trigger a statute of limitations presents a classic factual dispute that should be resolved by the finder of fact." *Id.* ¶ 13 (internal quotation marks omitted). Nevertheless, where undisputed facts demonstrate that a medical malpractice claim is time-barred, summary judgment is appropriate. *See Harper v. Evans*, 2008 UT App 165, ¶ 8, 185 P.3d 573 (affirming award of summary judgment where medical malpractice claim was barred by statute of limitations).

¶ 24 Summary judgment is appropriate when, viewing the facts and all reasonable inferences in favor of the nonmoving party, "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). We conclude that the trial court did not err in determining that no genuine issue as to any material fact existed here, and that Dr. Joseph and the Hospital were entitled to judgment as a matter of law.

¶ 25 The trial court ruled as a matter of law that the limitations period began to run "on October 13, 2004, or at the very latest, January 5, 2005," when "Plaintiff discovered, or through the use of reasonable diligence should have discovered, his legal injury." Mr. Roth contends that nothing in the record supports this conclusion. His position is that, until he deposed Dr. Voorhees on January 25, 2007, he was unaware of Dr. Joseph's alleged negligence.

¶ 26 The material facts are not in dispute. On May 24, 2004, Mr. Roth learned from Dr. Voorhees that Dr. Voorhees had not been able to find the tattoos during the colonoscopy, but nevertheless thought he had removed the correct portion of the colon. Mr. Roth thus learned on that date that there may have been a "problem." On October 13, 2004, Mr. Roth learned from Dr. Joseph at a follow-up visit that the relevant portion of the colon had not been resected, and an uninvolved portion of the colon had been resected. These events prompted Mr. Roth to request his medical records from Dr. Voorhees and Dr. Joseph. Mr. Roth received them on January 5, 2005. Those records included the June 8, 2004 note by Dr. Voorhees, who had resected the wrong portion of Mr. Roth's colon. In that note, Dr. Voorhees stated that during surgery he was unable to identify the tattoos, even with the benefit of a colonoscopy. He resected a portion of the colon but found the procedure "disconcerting because the area of previous biopsy is still not positively identified." He specifically observed that "the new dye that they are using rather than the India ink has equivocal results."

¶ 27 Even viewed in the light most favorable to Mr. Roth, these facts compel the conclusion that, by January 5, 2005, he discovered, or through reasonable diligence should have discovered, his " 'legal injury.' " *Daniels v. Gamma W. Brachytherapy, LLC*, 2009 UT 66, ¶ 25, 221 P.3d 256 (quoting *Foil v. Ballinger*, 601 P.2d 144, 148 (Utah 1979)). Learning that Dr. Voorhees had resected the wrong portion of the colon caused Mr. Roth to be aware of the alleged injury. And learning, or at least receiving the means to learn, that Dr. Voorhees attributed his confusion as to which portion of the colon to resect to faulty tattooing "would lead an ordinary person, using reasonable diligence," *Jensen v. IHC Hosps., Inc.*, 2003 UT 51, ¶ 61, 82 P.3d 1076, to "suspect" that Dr. Joseph "might have been negligent" and that his negligence "may be the source" of the injury or "its possible cause." *Daniels*, 2009 UT 66, ¶¶ 29–31, 221 P.3d 256.

¶ 28 Mr. Roth argues that the critical June 8, 2004 note was "an obscure office note" buried in "voluminous medical records" and therefore "does not really shed light on any determination that a negligent act occurred." He concedes that it may have prompted "further inquiry" but claims that he engaged in the requisite inquiry by deposing Dr. Voorhees in January 2007—a date fully two years after he received the medical records containing the June 8, 2004 note. However, in late 2004, Mr. Roth knew that Dr. Joseph was responsible for marking the section of

the colon to be removed, that Dr. Voorhees had had difficulty in locating the portion to be removed, and that Dr. Voorhees had removed the wrong portion of the colon. Then, in January 2005, Mr. Roth received his medical records. We do not agree that "an ordinary person, using reasonable diligence," *Jensen,* 2003 UT 51, ¶ 61, 82 P.3d 1076, would not have discovered the critical June 8, 2004 note until the opposing party pointed it out in a deposition two years later.

¶ 29 In sum, not later than January 5, 2005, Mr. Roth had discovered, or through reasonable diligence should have discovered, that Dr. Joseph's alleged negligence might have been the source of Mr. Roth's injury. Yet Mr. Roth did not file his notice of intent until May 9, 2007, two years and four months later. Consequently, his action was barred by the two-year statute of limitations. *See* Utah Code Ann. § 78B–3–404(1) (2008). We therefore affirm the trial court on this point.

B. Mr. Roth's Claim that Dr. Joseph Fraudulently Concealed Information Is Unavailing.

¶ 30 Mr. Roth also contends that Dr. Joseph fraudulently concealed the relevant facts, thus tolling the running of the statute of limitations until one year after he discovered the fraud. *See id.* § 78B–3–404(2)(b). Dr. Joseph responds that the facts do not establish the legal requirements of fraudulent concealment and that, in any event, Mr. Roth discovered his legal injury at the very latest January 5, 2005, more than two years before he commenced this action. We agree that Mr. Roth's fraudulent concealment claim does not assist him on these facts.

¶ 31 In medical malpractice cases, the running of the statute of limitations is tolled when a patient has been prevented from discovering the malpractice by the health care provider's affirmative acts of fraudulent concealment:

[I]n an action where it is alleged that a patient has been prevented from discovering misconduct on the part of a health care provider because that health care provider has affirmatively acted to fraudulently conceal the alleged misconduct, the claim shall be barred unless commenced within one year after the plaintiff or patient discovers, or through the use of reasonable diligence, should have discovered the fraudulent concealment, whichever first occurs.

*Id.* § 78B–3–404(2)(b); *see also Chapman v. Primary Children's Hosp.,* 784 P.2d 1181, 1184–87 (Utah 1989) (applying statute).

¶ 32 In his brief, Mr. Roth alleges that Dr. Joseph breached his duty to Mr. Roth by not informing him that Dr. Voorhees had failed to remove the polypectomy site and by not disclosing that he had used ink dye that could fade or disappear. Mr. Roth also insinuates that Dr. Joseph removed the June 8 letter from Mr. Roth's medical files. Finally, Mr. Roth alleges that in October 2004, Dr. Joseph actually retattooed the polypectomy site during a routine colonoscopy to cover up his earlier mistake. Mr. Roth contends that these fraudulent acts prevented him from discovering all the facts necessary to plead his claim until Dr. Joseph's January 25, 2007 deposition, when Dr. Joseph admitted that Dr. Voorhees was concerned about the type of ink dye being used. Therefore, Mr. Roth reasons, the statute of limitations did not expire until one year after January 25, 2007. *See* Utah Code Ann. § 78B–3–404(2)(b). Dr. Joseph responds that these allegations have not been pleaded with particularity, are speculative, and are, in any event, irrelevant.

¶ 33 We agree with Dr. Joseph that, even accepting as true all of the foregoing allegations and viewing them in the light most favorable to Mr. Roth's position, they do not demonstrate that Mr. Roth was "prevented from discovering misconduct," *id.* Whatever efforts Dr. Joseph may or may not have made to prevent discovery, they did not succeed. As we have already concluded, Mr. Roth discovered or reasonably could have discovered Dr. Joseph's alleged negligence not later than January 5, 2005, thus starting the running of the statute on that date. We therefore conclude that the fraudulent concealment statute does not salvage Mr. Roth's claim. *See id.*

CONCLUSION

¶ 34 The trial court did not abuse its discretion in setting aside the default certificate

entered against the Hospital and denying Mr. Roth's motion for default judgment. Nor did the trial court err in ruling that Mr. Roth's claim was barred by the statute of limitations as a matter of law. We therefore affirm the trial court's grant of summary judgment in favor of Dr. Joseph and the Hospital.

¶ 35 WE CONCUR: GREGORY K. ORME and STEPHEN L. ROTH, Judges.